[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 19-11466
_____

D.C. Docket No. 5:10-cv-00017-LGW


JAMES ALLYSON LEE,

                                                        Petitioner-Appellant,

versus

GDCP WARDEN,

                                                        Respondent-Appellee.
_____

Appeal from the United States District Court
for the Southern District of Georgia
_____

(February 11, 2021)

Before NEWSOM, GRANT, and ED CARNES, Circuit Judges.

GRANT, Circuit Judge:

    James Allyson Lee, a Georgia prisoner sentenced to death for the murder of

Sharon Chancey, appeals the district court's denial of his federal habeas corpus

petition, filed pursuant to 28 U.S.C. § 2254.  Lee contends that his attorneys

violated his Sixth Amendment right to effective assistance of counsel by failing to adequately investigate and present mitigating evidence in the sentencing phase of his capital murder trial. The Georgia Supreme Court rejected Lee's ineffective-assistance claim in state postconviction proceedings on the ground that he failed to show that the allegedly deficient performance prejudiced him, as required under *Strickland v. Washington*, 466 U.S. 668 (1984). The district court found that the Georgia Supreme Court's decision was not an unreasonable application of federal law and denied Lee's § 2254 petition. After careful consideration, and with the benefit of oral argument, we affirm.

## I.

## A.

One night in May 1994, after stealing several handguns from a gun shop and driving around for a while with his friend Shannon Yeoman, James Lee decided to steal his father's prized pickup truck, a 1992 Chevrolet Silverado. Lee later told the police that he wanted to kill his father—and probably would have if things had gone as planned—because his father had abused and abandoned Lee and his mother when Lee was a child. The plan was for Yeoman to lure Lee's father out to a nearby highway by telling him that Lee needed help with a broken-down car. Putting the plan in motion, Lee dropped off Yeoman near the trailer park where his father lived and drove Yeoman's Toyota to the meeting place to wait.

Right away, Lee's plan hit a snag: his father was out of town. The father's live-in girlfriend, Sharon Chancey, was home alone, but refused when Yeoman asked her to drive the truck to help Lee. Lee, meanwhile, had really been "hoping

2

it would be [his] dad"; he had worked himself up thinking about the things that his father "had done to [Lee] when [he] was small and the things that he had done to [Lee's] mother, and the life that she chose from those things." When Yeoman reported that only Chancey was home, Lee "still had those emotions and those feelings going," and he thought, "You'll do."

He sent Yeoman back to try again, telling her to insist that Chancey come out to help him with the supposedly broken-down old Toyota. When Chancey still refused, Lee went into the trailer himself to persuade her. Lee later said that Chancey was reluctant because Lee's father didn't like her driving his truck, but she eventually agreed to help. At trial, the parties disputed whether Chancey left the trailer voluntarily—she was wearing only a nightshirt and panties, had no shoes on, and had left her dentures at home, which was apparently something she never did.

One way or another, at about 4:00 in the morning, Chancey and Yeoman drove in the prized Silverado truck to Highway 84 near Blackshear, Georgia, where Lee had set his trap. After arriving, Chancey got out of the truck and walked over to the Toyota, and Lee used one of his stolen guns to shoot her in the face.[1]

Lee picked up Chancey's apparently lifeless body and threw her in the back of the Silverado. After stopping for gas—with Chancey still half-naked and bleeding in the truck bed—Lee drove approximately 50 miles to a remote area. He

---

[1] Lee consistently maintained that he walked up behind Chancey and shot her in the back of the head as she bent over to look into the Toyota. But the medical examiner testified that Chancey had been shot in the face, not in the back of the head.

dragged Chancey out of the back of the truck, pulling off her nightshirt in the process, and dumped her in the woods wearing only her panties. Before leaving, Lee began to pull Chancey's rings off her fingers, and she grabbed his hand. Lee took out his gun and fired three more shots, hitting Chancey once more in the face and once in the abdomen.

Lee and Yeoman left Chancey's body in the woods and drove the Silverado to Fernandina Beach, Florida, where Yeoman's family lived. Lee mentioned the murder to various friends and acquaintances that day, telling several people that the blood in the back of the truck was from a woman he'd killed, and at one point calling Chancey a "dead bitch[]." Apparently, none of his friends believed him.

The police were easier to convince. That night, as Lee was driving with two of his friends in the Silverado, a Florida state trooper pulled him over for an equipment violation. Lee gave one of his friends a pistol and told him to "get out and shoot the cop," but his friend dropped the pistol on the floor and kicked it under the seat. Meanwhile, the trooper discovered that the tag on the Silverado was registered to Yeoman's 1980 Toyota. He soon determined that the Silverado did not belong to any of its occupants, and that Chancey, whose purse and identification were in the Silverado, was missing. When questioned, Lee eventually confessed that he had killed Chancey and taken the truck.

Lee later gave videotaped statements at the scenes of both shootings, describing how he had shot Chancey once on the side of the highway, and three more times after dumping her in the woods. He told the police that he had planned to kill his father and killed Chancey instead of him because she was there.

4

Lee was charged with murder, kidnapping, armed robbery, theft by taking, possession of a firearm during commission of a felony, and possession of a firearm by a convicted felon. He pleaded not guilty and proceeded to trial in Charlton County, Georgia, where Chancey's body was found. The state elected not to prosecute the charge of possession of a firearm by a convicted felon, and the trial court granted Lee's motion for a directed verdict for lack of venue on the charges of kidnapping and theft. The jury found Lee guilty of the remaining charges.

During the sentencing phase, the state presented evidence that at the time of the murder, Lee had been on probation for stealing a truck and breaking into a church two years earlier. The state also presented evidence that about two months before the murder, Lee and a man named Doug Gregory stole a car outside Atlanta and drove it to Florida. There, Lee and four or five of his friends took Gregory out to an area called the Point and brutally beat him. Gregory testified that before the beating, Lee told his friends that there was going to be an "initiation," and that he "wanted to see blood, a lot of blood." Lee started the beating by hitting Gregory with a stick about the size of a baseball bat. He hit Gregory at least four times in the head with the stick, while his friends beat Gregory with more sticks and a metal folding chair until he was covered in blood from head to toe. After the beating, Lee threatened Gregory that if he went to the police, he "wasn't anything but a bullet."

The state also presented evidence that while awaiting trial on the murder charge, Lee escaped from jail in Georgia, stole a car and some clothes, and fled to Florida. After the police recaptured him, Lee gave yet another audiotaped

5

statement in which he confessed to killing Chancey. For the first time, he claimed that he was on "acid" at the time of the murder. He also reiterated, however, that he had wanted to kill his father and insisted that he would still kill him, even if he were sober. He was angry; he said that his father beat his mother when he was little, and his mother turned to drugs when his father left them, so he never really had a mother or father. He also swore that he would kill the investigator and the GBI agent in charge of his murder case if he ever got the chance and said that he would have shot at the police when he was arrested after the escape if he had had a gun. When asked if Chancey's murder was the first time that he had killed someone, he responded in the affirmative, but added more: "Yep. But, killing's so easy. Now that I've done it once, it wouldn't be hard doing it." He qualified this chilling statement by saying that he "wouldn't go out and do it" and he pointed out that he had not killed anyone besides Chancey, even when he'd had the opportunity.

Lee presented the testimony of seven mitigation witnesses: Denise Baxley, who was one of his elementary school teachers; Johnny Lee, his father; Melton Lloyd, his stepfather; Barbara Lloyd, his mother; Mavis Garrison, his house mother from the Boys' Ranch where he lived from the ages of 15 to 17; Daniel Grant, Ph.D., a psychologist who performed a battery of neuropsychological tests; and Lee himself.

The first witness was Baxley, Lee's special education teacher for two years when he was seven to nine years old. Lee had been evaluated and placed in a class for severely emotionally disturbed students. Lee was very impulsive and had

6

"some basic security problems." He also had trouble paying attention and was being treated with Ritalin for hyperactivity. Baxley testified that she conducted occasional home visits as part of the special education program, and she always found his home to be in "disarray"—whether he lived alone with his mother or with his grandparents. Parental involvement was an integral part of the special education program, but although Lee's mother participated to "the best of her ability probably," she never followed up on Baxley's suggestions for after-school activities, and never really provided any kind of authority figure for Lee. Baxley never observed Lee being cruel or mean to other people.

Lee's father, Johnny Lee, testified that he had six children and had been married seven times. He was married to Lee's mother Barbara, but the two separated when Lee was about five years old. While they were married, Johnny and Barbara did "a lot of drinking" and "had fights," though Johnny testified that he could not remember hitting Barbara in front of Lee. Johnny abandoned Lee after the separation; he never visited him or paid much child support. Johnny did not project a sympathetic picture of himself as a father. But he was not able to project a sympathetic picture of Lee either; in fact, he admitted that if he were asked what Lee's good qualities were, he probably would not be able to name any.

Several months before the murder, Johnny bailed Lee out of jail and Lee moved in with Johnny and Chancey for two or three months. As far as Johnny was aware, Chancey never said an unkind word to Lee.

Lloyd, Lee's stepfather, moved in with Lee and his mother Barbara in 1984, when Lee was ten, and married her three years later. Before he met Barbara, Lloyd

7

was in prison for 12 years for second-degree murder. Lloyd and Barbara had a son, who was Lee's half-brother. According to Lloyd, Lee loved the boy and helped take care of him and look out for him when he was small. Lloyd testified that Lee had a good side and was worth saving.

Lee's mother testified that she had Lee when she was 19 years old. She frequently took narcotic pain medication while she was pregnant with Lee. She admitted that she had a long-term addiction to prescription drugs, but said that she "hope[d]" that she was a good mother to Lee despite her addiction.

Lee's father left when Lee was young and never provided financial support. His mother testified that she did the best she could on welfare, and that there was always enough food to eat. Lee and his mother lived with her parents until Lee was about six, and at one point, his mother left Lee with her parents for about a year and a half when she moved to Florida with a boyfriend.

Lee was extremely hyperactive as a child and was placed in the special education program because of it. He couldn't sit still or concentrate; he barked like a dog and didn't talk until he was six years old. He took Ritalin until he was seven years old, when someone at the county mental health center told Barbara that the Ritalin was actually making Lee's condition worse.

When Lee was about 13 years old, his mother contacted the Sheriff's Boys' Ranch and began the process to have Lee admitted to the program. Lee spent two years at the Boys' Ranch, from age 15 to age 17. After the Boys' Ranch, Lee couldn't keep a job and just hung around the house. He never had many friends, but he was not mean or violent. Lee hated his father for abandoning him.

8

Mavis Garrison, Lee's house mother at the Boys' Ranch, testified that Lee did well in the structured environment there. From what Lee and the social worker told her, Garrison thought that Lee's problems with authority and anger came from his home life, where there were "many problems," including drugs and alcohol. Lee was very angry with his father for abandoning him. He was also angry with his mother, who he thought had rejected him for his stepfather. Lee called Mr. and Mrs. Garrison "mom" and "pop"; he told Garrison that she had been more of a mother to him than anyone ever had. There were times that Lee became defensive or angry at the Boys' Ranch, but Garrison was never afraid of Lee, and he always came back and reconciled with her after an argument, telling her that he loved her. Lee frequently returned to visit the Garrisons at the Boys' Ranch; he was married at the chapel there and the Garrisons held a wedding reception for him. Garrison became emotional during her testimony; she said that she loved Lee, that he was a "very loving and caring person," and that he was "very much worth saving."

Dr. Grant testified that he spent 17 or 18 hours with Lee, conducting neuropsychological tests and interviewing him, and he reviewed school records covering kindergarten through sixth or seventh grade, including two school psychological evaluations. He also reviewed the state psychologist's report from his pretrial evaluation of Lee. Based on his evaluation, Dr. Grant testified that Lee was of low average intelligence and suffered from attention deficit disorder with hyperactivity and polysubstance abuse. Lee's attention disorder meant that he had a hard time staying on task. It also meant that he was restless and impulsive, and had a hard time controlling his behavior. Individuals with ADHD are born that

9

way, he said, although he did not suggest that the condition meant Lee was not responsible for his behavior. Based on the early age of manifestation, Lee had a severe and more refractory case of ADHD; he had not grown out of his disorder. Dr. Grant also noted that people with early-onset ADHD were more likely to develop other psychopathologies—like oppositional defiance disorder, substance abuse, or "shifting of moods"—but adjust very well with a structured environment (such as prison) and medication.

Dr. Grant testified that it would not be uncommon for someone with Lee's condition to lie or boast to project an image of bravado or toughness as a cover for their low self-esteem. In Lee's case, he acted tough to cover his feelings of abandonment. Lee did not come across as mean or malicious in Dr. Grant's interviews, and Dr. Grant saw nothing in Lee's school records he reviewed to indicate that he had ever been aggressive toward people. When asked whether people with Lee's condition would be more likely to carry out their threats, Dr. Grant reiterated that those with hyperactivity had a hard time regulating and controlling their emotions and behavior.

According to Dr. Grant, Lee's home environment made his condition much worse, because "starting very early in his life, there was deprivation at times, where there wasn't even adequate food in the home, the abandonment by his father, that his father left. There was a lot of abuse, frequent changing and inconsistent rules or caregivers." None of Lee's early caregivers appeared to be a positive influence: "You know, he and his mother lived together for awhile, and she had a problem with substance abuse and was inconsistent in her behavior. A

10

lot of times, he was left alone. Then, you know, they stayed with his grandparents, and there was some physical abuse as well as neglect." Still, Dr. Grant testified that one thing mattered even more to Lee: the absence of his father. As he explained it to the jury, "more importantly, what he talks about when I interviewed him, and what's in several of the school reports, is the fact of his being abandoned, especially, you know, with his father, of not having—And his father had other children later, and his father would participate with those children but wouldn't with Jamie, so there's a lot of—You know, that really had a very powerful negative impact on his development."

Against his attorneys' advice, Lee testified on his own behalf at sentencing. Lee testified that he "thought" that he had killed Chancey, but he recalled shooting her in the back of the head as she leaned over to look into the Toyota, which did not line up with the evidence that she was shot in the face. For the first time, Lee disclosed that he had gone inside his father's home with Yeoman when her attempts to lure Chancey out were unsuccessful; he had previously told the police that he waited nearby while Yeoman finally persuaded Chancey. He said that he told Chancey that a friend (who "didn't want to be known") had given him a ride to the trailer and was waiting outside for him, but he still needed her to bring the Silverado and help him crank the broken-down car.

Lee's testimony at sentencing was otherwise generally consistent with his statements to the police—he admitted that he and Yeoman lured Chancey out to the highway and that he shot her, dumped her body in the woods, and shot her again. This time, however, Lee insisted that Chancey was dead after he fired the

11

first shot; he denied that her hand had moved after he dumped her body. He could not say why he had fired at her three more times, or why he had told the police that Chancey grabbed him.

When asked why he shot Chancey, Lee said that he was upset with his father because of "the things that he had done to [Lee] when [he] was small and the things that he had done to [Lee's] mother, and the life that she chose from those things." Lee said, "It upset me and it hurt me, and when she got there and it wasn't him, I still had those emotions and those feelings going, and they control me." Lee said that he was sorry he killed Chancey, more so since he had been baptized (while in prison) and realized that Christ died for him and for Chancey. He said that he liked Chancey, and that she had never been mean to him or done anything bad that he knew of.

Lee also said that he would not really have shot at the police after he was pulled over or when he was recaptured after his escape from jail. He claimed that he had not really told his friend to shoot the police officer who pulled them over; he just told his friends to say that later so that they would not get in trouble. As for his statement to the police that it was easy to kill or that he wanted to kill his father, he denied that he meant that either—although, he added, he probably would have killed his father if he had been home that night. On cross-examination, Lee admitted writing a letter to his girlfriend while he was in jail that said (of his father), "I hate him. I believe he knows it. I'll kill him if I ever get my hands on him, which will be never or in hell."

12

Lee did admit that he participated in the beating of Doug Gregory, but denied that he said anything about an initiation and explained that Gregory had been spying on girls in the shower in the house where all of them were staying. He asked the jury to show mercy and sentence him to life with the possibility of parole, or at worst, life without parole.

After deliberating for a little more than two hours, the jury returned a sentencing verdict of death. The jury found four statutory aggravating factors: (1) the murder was committed while the defendant was engaged in the commission of another capital felony (kidnapping with bodily injury); (2) the murder was committed while the defendant was engaged in the commission of another capital felony (armed robbery); (3) the defendant committed the murder for himself or for another for the purpose of receiving money or something of monetary value; and (4) the murder was outrageously or wantonly vile, horrible, or inhumane, in that it involved aggravated battery to the victim before death.

The trial court sentenced Lee to death for murder, life in prison for armed robbery, and five years consecutive for the firearm charge. *See Lee v. State*, 270 Ga. 798, 799 n.1 (1999). The Georgia Supreme Court unanimously affirmed Lee's convictions and sentences, and the U.S. Supreme Court denied Lee's petition for certiorari and petition for rehearing. *Id.* at 803; *Lee v. Georgia*, 528 U.S. 1006 (1999) (Mem.), *reh'g denied*, 528 U.S. 1145 (2000) (Mem.).

## B.

Lee filed a state petition for habeas corpus, arguing, among other things, that his trial counsel was constitutionally ineffective during the sentencing phase. At

13

the evidentiary hearing on his petition, Lee's trial attorneys testified live and Lee presented numerous affidavits, as well as extensive school and medical records, records from the Boys' Ranch, and records from the Department of Corrections.

As relevant to the claim before us, Lee presented affidavits from relatives and neighbors testifying that Lee's mother abused and neglected him throughout his childhood. According to these witnesses, his mother was usually drunk or on drugs, with a different man or group of men at a local bar or hanging around the house. Lee was described as constantly filthy and stinking, with lice in his hair, wearing filthy rags, and with rotting teeth, a sign of possible malnourishment. He begged for food from neighbors, telling them that he was hungry because he had worms. His home was also described as filthy, with dirty clothes, dishes, beer and prescription bottles, roaches, and garbage strewn everywhere. Lee complained to one relative that he had rats crawling in his bed.

As a baby and toddler, Lee jumped and bounced in his crib constantly—likely as self-stimulation or to get his mother's attention—to the extent that he broke the crib more than once. His grandfather eventually reinforced it with two-by-fours nailed to the wall to form a kind of cage. As a toddler and a child, Lee was often left alone in the house, left in the car, or dropped off while his mother went out to bars and stayed out overnight or for days at a time. Other times, Lee's mother sent him outside and told him that he could not come back in until dark.

According to the affidavit witnesses, Lee endured physical and emotional abuse in addition to neglect—and that abuse was described as constant and vicious. Lee's mother frequently "beat the crap" out of him, even as a toddler, slapping him

14

hard enough to leave a mark, punching him, or swinging him around by his hair, usually for little or no reason. She typically called him names like "little bastard" or "fuckhead," and yelled at him, again, with little or no provocation. Neighbors and family members said that they never really heard Lee's mother say anything nice to him or saw her hold him or play with him. One relative could not remember Lee's mother ever speaking to him in a normal voice—she always yelled at him, even if he was a few feet away, and would call him over to the couch to slap him.

Witnesses described several specific instances of physical abuse, including one time when Lee was two years old and his mother slapped him hard across the face, leaving a mark. When his aunt protested, Lee's mother said that he was her child and she could do what she wanted to him—she could "take him by the feet and slap him up against the wall if she wanted to," or "splatter the little motherfucker's brains everywhere" if she felt like it. Another witness described an incident when Lee was little (four or five years old) and grabbed his mother's shirt to get her attention. She responded by punching him in the mouth so hard that he flew backwards, bleeding from his mouth. Other witnesses recalled similar instances of Lee's mother punching him with no provocation, knocking him down and kicking him in the head, or cussing him out, slapping him, and sending him to his room when he asked for a glass of water. Lee's relatives described him as cowering and afraid of his mother, but loving and eager to please when she was not around.

15

One of Lee's elementary school teachers reported Lee's mother to the state children's services agency after Lee came to school with welts on his arms and face that were "horrifying to view." To the teacher's knowledge, the agency did nothing in response to her complaint.

Affidavits presented to the state postconviction court also indicated that Lee showed signs of emotional damage as a child. He often acted like a dog, panting and crawling on all fours and barking instead of speaking. This behavior went beyond normal play—so much so that it troubled those who saw it. In school, he often talked about how much he hated his father for leaving him and his mother alone, but also said that he wanted to see his father. In kindergarten, he would often slap and hit himself in the face and say that he wanted to kill himself. At home, he would bang his head against the wall. As a preschooler, he once put his head under the tire of his mother's car.

Based on the new information about childhood abuse and additional records provided by habeas counsel, Dr. Grant testified that his earlier diagnosis of ADHD was "wholly inadequate to explain or define Jamie's emotional and mental disabilities and how these disabilities related to the death of his father's girlfriend." Dr. Grant opined that, at the time of the murder, Lee was suffering from Post-Traumatic Stress Disorder as a result of the "repeated and savage abuse" he suffered at the hands of his own mother.

Lee also presented the affidavit testimony of a new psychological expert, Catherine Boyer, Ph.D., who stated that Lee was "significantly impaired emotionally, psychologically, and cognitively" as a result of the abuse and neglect

16

he suffered, and that "unlike most cases, there is a direct relationship between the neglect and abuse, the resulting impairments and the crime."

The state habeas court granted Lee's petition, finding that Lee's trial counsel "rendered prejudicially deficient performance in investigating Mr. Lee's potential sentencing phase defenses and in preparing and presenting the mitigation defenses counsel did utilize." The state court judge presiding over the habeas proceedings—a different judge than the one who presided over Lee's trial and imposed his sentence—explained that "Mr. Lee's early life bears all the hallmarks of a strong mitigation case: a boy whose troubles began before he got out of the womb, he was born into a home rife with abuse, neglect, and trauma at the hands of his addicted caregivers. Nearly every aspect of his early life was uniquely troubled; nevertheless, the State was able to argue credibly to the jury that Mr. Lee was like a million other kids with a learning disability and a single mom."

The Georgia Supreme Court reversed in a unanimous opinion. *See Hall v. Lee*, 286 Ga. 79 (2009). The Court discussed counsel's mitigation investigation and strategy with what seemed like approval, but ultimately decided that it need not address counsel's performance under *Strickland* because Lee had not made the required showing of prejudice. *Id.* at 81–86.

## C.

Lee filed a petition for federal habeas review in the Southern District of Georgia, pursuant to 28 U.S.C. § 2254. The district court denied Lee's habeas petition but granted him a certificate of appealability on one issue: "whether the Georgia Supreme Court's determination—that Lee was not prejudiced by any

17

deficiency on the part of Lee's trial counsel in investigating, developing, preparing, and presenting mitigating evidence at Lee's sentencing—involved an unreasonable application of clearly established Federal law or was based on an unreasonable determination of the facts in light of the evidence presented."

## II.

Federal courts are authorized to grant habeas corpus relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). We review a district court's denial of habeas relief under § 2254 de novo. *Brooks v. Comm'r, Alabama Dep't of Corr.*, 719 F.3d 1292, 1299 (11th Cir. 2013).

As amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), § 2254(d) limits the power of federal courts to grant relief on a claim that was denied on the merits by a state court to occasions where the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." A state court's decision is "contrary to" clearly established federal law if the state court either reaches a conclusion opposite to the Supreme Court of the United States on a question of law or reaches a different outcome than the Supreme Court in a case with "materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle" from

18

Supreme Court precedents "but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.

Lee does not contend that the Georgia Supreme Court's decision was "contrary to" U.S. Supreme Court precedent, and there is no question that the state court correctly identified *Strickland* as establishing the applicable legal standard. *See Evans v. Sec'y, Dep't of Corr.*, 703 F.3d 1316, 1327 (11th Cir. 2013) (en banc). We must determine, therefore, whether the state court's decision involved an unreasonable application of the *Strickland* standard to the facts of Lee's case.[2] To grant relief under the "unreasonable application" clause, we must find that the state court's decision was "'objectively unreasonable,' not merely wrong; even 'clear error' will not suffice." *White v. Woodall*, 572 U.S. 415, 419 (2014) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 75–76 (2003)). This means that to obtain federal habeas relief, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). We proceed, therefore, by setting out the relevant legal standards for

---

[2] Lee also argues that the Georgia Supreme Court made unreasonable and clearly erroneous findings of fact. As relevant to our analysis, Lee contends that the Georgia Supreme Court erroneously discounted his new affidavit evidence because it found that "much of it" was properly excluded by the habeas court as hearsay or speculation. Lee concedes that some of the affidavit testimony may be hearsay, but he notes that the habeas court excluded only a small portion of what was challenged, not "much of it." Lee has not pointed to any specific relevant evidence that the Georgia Supreme Court discounted or declined to consider on this ground, however—indeed, the Court's opinion made specific references to its review of the new expert testimony and evidence of abuse that Lee relies on in this Court. Because Lee cannot show that the state court's decision "was based on" the challenged findings, they provide no basis for federal habeas relief whether or not those findings were unreasonable. 28 U.S.C. § 2254(d)(2).

19

ineffective-assistance claims and reviewing the Georgia Supreme Court's application of those standards to the facts of Lee's case.

### III.

To prevail on his Sixth Amendment ineffective-assistance claim, Lee was required to make the familiar two-pronged showing required by *Strickland*: "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Because the petitioner must make the required showing on both prongs of the *Strickland* test, a court may conduct its inquiry in any order and need not address both components of the test if the petitioner's showing falls short on either one. *Id.* at 697. In particular, where it is easier to avoid assessing counsel's performance and resolve the petitioner's claim on the ground that he has not made a sufficient showing of prejudice, courts are encouraged to do so. *Id.*

That is the route that the Georgia Supreme Court took, and we too "begin and end our analysis with *Strickland*'s prejudice prong." *Brooks*, 719 F.3d at 1301. To show prejudice under *Strickland*, the "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

20

"This does not require a showing that counsel's actions 'more likely than not altered the outcome,' but the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters 'only in the rarest case.'" *Harrington*, 562 U.S. at 111–12 (quoting *Strickland*, 466 U.S. at 693, 697). And the "likelihood of a different result must be substantial, not just conceivable." *Id.* at 112.

In evaluating prejudice in a capital sentencing proceeding, the question is whether there is a reasonable probability that, in the absence of counsel's errors, the sentencer "would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. The reviewing court must therefore reweigh all of the available mitigating evidence, including the newly gathered evidence presented in the habeas proceedings, against the evidence presented in aggravation. *Wiggins v. Smith*, 539 U.S. 510, 534, 536 (2003). The Georgia Supreme Court conducted this exercise and concluded that it saw no reasonable probability that the jury would have returned a different sentencing verdict if the additional mitigating evidence that Lee submitted during the state habeas proceeding had been presented at trial. *Lee*, 286 Ga. at 87–97.

Lee argues that this decision was an unreasonable application of *Strickland* because in reaching its conclusion, the state court unreasonably discounted his new mitigating evidence and overstated the evidence in aggravation. We do not agree—and we reiterate that under AEDPA, the question before any federal court is not whether we would reach the same conclusion as the state court if we were to reweigh the evidence ourselves, but whether there is any "possibility fairminded

21

jurists could disagree that the state court's decision conflicts with" relevant Supreme Court precedents. *Harrington*, 562 U.S. at 102. If so, then we lack the authority to grant habeas relief. *Id.* at 102–03; *see Brooks*, 719 F.3d at 1300.

Here there is, at the very least, room for debate. To begin, this is not a case where the jury had no mitigation evidence to consider at sentencing. Although Lee's trial presentation lacked the vivid detail provided by his habeas witnesses, the jury heard that Lee was disadvantaged, neglected, and abused throughout his childhood. They learned that Lee's parents drank heavily and fought violently when he was little, and that Lee's mother abused prescription drugs, smoked marijuana, and neglected Lee to the point that he didn't always have enough to eat. They heard about Lee's placement in a class for severely emotionally disturbed children, his basic security issues, and his behavioral problems. Dr. Grant testified that Lee endured "a lot of abuse," including physical abuse as well as neglect, and that his emotional and behavioral problems were made much worse by his home environment. The jury also heard that people with Lee's condition tended to be boastful, and had difficulty controlling their emotions and behavior.

In addition to describing Lee's impoverished and difficult childhood and psychological condition, some of Lee's sentencing-phase witnesses also gave positive testimony about his character as an adult. Lee's stepfather testified that Lee was close to and helped care for his young stepbrother, and Lee's housemother from the Boys' Ranch spoke of him with genuine and tearful affection.

The affidavit testimony submitted to the state habeas court added to this somewhat basic picture by providing graphic and horrifying descriptions of the

22

physical and emotional abuse and neglect Lee endured at his mother's hands—details showing a frequency and severity of abuse that was only hinted at during Lee's trial presentation. These details led Dr. Grant to retroactively diagnose Lee with PTSD, and Lee's new expert witness testified that Lee's emotional problems likely contributed to his involvement in the murder.

Still, the Georgia Supreme Court's decision that the combined weight of Lee's mitigating evidence would not have changed the sentencing verdict was not objectively unreasonable. The state court discussed Lee's mitigating evidence, old and new, in detail and concluded that the frequent slaps, occasional punches or kicks, neglect, and verbal abuse described by Lee's witnesses did not establish that his childhood was "so harmful or horrific" that it might be expected to reduce Lee's moral culpability in the eyes of a jury. *Lee*, 286 Ga. at 87–92 (citing *Wiggins*, 539 U.S. at 538, in which the U.S. Supreme Court held that the defendant's evidence of torture, severe deprivation, and sexual abuse was reasonably likely to change the outcome at sentencing).

The state court also pointed out that Lee's new expert testimony failed to make a convincing connection between the psychological impact of his childhood abuse and his actions on the night of the murder. Dr. Grant testified that the additional evidence of abuse would have enabled him to diagnose Lee with PTSD and explain the connection between Lee's PTSD and his crimes, but he never actually provided any such explanation. And Dr. Boyer's opinion that his "impaired impulse control, impaired emotional control, high levels of distress, and his inability to structure or stabilize his own life" made him "particularly

23

vulnerable to involvement in the murder" was not meaningfully different from Dr. Grant's trial testimony that people like Lee with ADHD were impulsive and overactive, had problems with planning and organization, and had difficulty controlling their emotions and behavior.

Moreover, the aggravating evidence presented to the jury was substantial. This included evidence that Lee had planned to kill his father, and that when he found out that his father was not home, he decided that Chancey would make a good enough substitute—despite her past kindness to him. Lee's testimony at sentencing also revealed that when Yeoman was unable to convince Chancey to help, Lee himself went into the home to talk to her. The story that Lee says he gave Chancey to account for his presence—that he had a mysterious friend with a car who did not want Chancey to see him and who was willing to drive Lee back and forth from the broken-down Toyota but was inexplicably unable to help him jump start it—was exceedingly flimsy. Lee's testimony that this unlikely tale persuaded Chancey to come out in the middle of the night cast a sinister light on the evidence that she left her home in panties and a nightshirt, barefoot and without her dentures, and it opened the door to the prosecutor's argument that she did not go voluntarily.

The evidence also showed that, however Chancey got to the scene, the murder itself was cold-blooded and brutal—after coaxing Chancey out of her home by telling her that he needed her help, Lee shot her in the face, drove her wounded and bleeding to the middle of nowhere, dumped her in the woods, and shot her again when she grabbed his hand. Lee showed no remorse for killing Chancey—

24

and indeed, bragged about it to his friends—until after he was caught. And finally, the state presented evidence that Lee had brutally beaten a man months before the murder because he wanted to "see blood, a lot of blood," that he had tried to convince one of his friends to shoot a state trooper after the murder, that he said he would have shot at the police after his escape from jail if he had had a gun, and that he threatened to kill his father and the officers who investigated Chancey's murder if he ever had the chance.

In short, it was not unreasonable for the Georgia Supreme Court to conclude that there is no reasonable probability of a different result if Lee's trial attorneys had collected and presented the mitigating evidence proffered to the state habeas court. That is all that AEDPA requires. "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington*, 562 U.S. at 102. And because the state court's decision was at least arguably correct, we are precluded from granting Lee's petition for federal habeas relief. *See id.* at 102–03; *Brooks*, 719 F.3d at 1300.

## IV.

The denial of Lee's petition for a writ of habeas corpus is **AFFIRMED.**

25