# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2021-CA-01313-SCT

*DEVIN ALLEN BENNETT*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 04/01/2021 |
| TRIAL JUDGE: | HON. DEWEY KEY ARTHUR |
| TRIAL COURT ATTORNEYS: | MERRIDA COXWELL |
| | WILLIAM CHARLES BELL |
| | GLENN S. SWARTZFAGER |
| | SCOTT A. C. JOHNSON |
| | LOUWLYNN VANZETTA WILLIAMS |
| | CAMERON LEIGH BENTON |
| | JASON L. DAVIS |
| | ALEXANDER DUNLAP MOORHEAD |
| | KASSOFF |
| | ALLISON KAY HARTMAN |
| | THOMAS M. FORTNER |
| | BRANDON KYLE MALONE |
| | PARKER ALAN PROCTOR, JR. |
| | BRAD ALAN SMITH |
| | CANDICE LEIGH RUCKER |
| | WILLIAM CHARLES BELL |
| COURT FROM WHICH APPEALED: | RANKIN COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF CAPITAL POST-CONVICTION COUNSEL |
| | BY: KRISSY CASEY NOBILE |
| | THOMAS M. FORTNER |
| | MARY JO WOODS |
| | SUE ANN WERRE |
| | BRANDON KYLE MALONE |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: PARKER ALAN PROCTOR, JR. |
| | BRAD ALAN SMITH |
| NATURE OF THE CASE: | CIVIL - DEATH PENALTY - POST CONVICTION |

DISPOSITION:                          AFFIRMED - 11/16/2023
MOTION FOR REHEARING FILED:


**EN BANC.**

**ISHEE, JUSTICE, FOR THE COURT:**

¶1.    In February 2003, Devin Bennett was found guilty of capital murder, and a jury sentenced him to death. ***Bennett v. State (Bennett I)***, 933 So. 2d 930, 938 (Miss. 2006). This Court affirmed Bennett's conviction and sentence on appeal. ***Id.*** at 956.  In 2006, Bennett sought leave from this Court to file a motion for post-conviction relief. ***Bennett v. State (Bennett II)***, 990 So. 2d 155 (Miss. 2008).  This Court ultimately determined that Bennett was entitled to seek post-conviction relief on his claim of ineffective assistance of counsel during the penalty phase of his trial. ***Id.*** at 162.  Bennett filed his PCR petition on October 1, 2008, and an amended petition on May 16, 2012. On March 25, 2021, the circuit court held an evidentiary hearing, and it ultimately denied Bennett's amended petition.

¶2.    Bennett now appeals.  He argues:

> (1) trial counsel was inexperienced in capital litigation and conducted no mitigation investigation or preparation for the sentencing phase of trial; (2) trial counsel's representation was so deficient that prejudice is inherent and should be presumed; (3) even if prejudice is not presumed, it is established because there exists a reasonable probability of a different sentence, and the sentencing phase was fundamentally unfair based on trial counsel's complete failure to prepare; and (4) the circuit court compounded its constitutional error by excluding relevant mitigation evidence in post-conviction based on a non-existent state rule.

¶3.    Ultimately, we conclude that while counsel might be faulted for not more thoroughly investigating the alternative mitigation case Bennett presented at the PCR hearing, we cannot

find any reasonable probability that doing so would have led to a different outcome. In fact, although Bennett had fifteen years to assemble an alternative mitigation case, we agree with the trial judge that the additional evidence would have hurt Bennett more than it helped him. We affirm the denial of post-conviction relief.

**FACTS**

¶4. In ***Bennett I***, the direct appeal from Bennett's conviction, this Court explained in detail the circumstances that led to Bennett's conviction and death sentence for the murder of his infant son, Brandon:

> Brandon Allen Bennett ("Brandon") was born in June 2000 to Yolanda Lewis ("Lewis") and the Appellant, Devin Bennett ("Bennett"). Two months later on August 25, 2000, at 8:45 a.m., Bennett took Brandon to River Oaks Hospital where nurse Collette Moreland ("Moreland") took Brandon from Bennett, noting that the baby was pale, cold, and not breathing. The medical records indicate Brandon was asystolic, meaning he had no heartbeat or pulse.

> Moreland took Brandon to the emergency room where she began mouth to mouth resuscitation and chest compressions. Brandon was intubated, and an IV was started. Two more nurses, an emergency room doctor, a neonatologist, and a respiratory therapist were called in to assist with Brandon's condition. After approximately twenty-five minutes, Brandon's heartbeat returned.

> Bennett initially did not follow Moreland when she took Brandon into the emergency room. Later, when asked by the medical staff what happened to Brandon, Bennett said he awoke around four o'clock that morning to find that Brandon "appeared to have slipped out of his car seat onto the floor." This was Bennett's first of at least seven different versions of the events leading to Brandon's death. When questioned by two social workers at River Oaks, Bennett offered two accounts of the story. He told Jerri Strickland ("Strickland") that he noticed the baby breathing funny sometime around four o'clock in the morning and he gave him a bottle and placed him in a car seat. He then told Strickland that he awoke later to find Brandon on the floor. However, when he spoke with social worker Leslie Jacobs ("Jacobs"), he told her that sometime around eight o'clock that morning he found the infant on the

3

bedroom floor. Bennett specifically stated to Jacobs that the car seat in which he placed Brandon was located on the floor—not on the bed. He also told Jacobs that because Brandon was very strong, he must have moved around in his seat and toppled onto the floor. Both Strickland and Jacobs noted that Bennett was acting in an odd fashion.

Ultimately, after Brandon's heartbeat returned, the medical staff decided to transfer him to the pediatric unit at the University of Mississippi Medical Center in Jackson ("UMC"), which they felt was better equipped to handle an infant in Brandon's condition. Upon his arrival at UMC, Brandon was in a coma, unresponsive, and on life support. Rebecca Pruitt ("Pruitt"), a social worker in the neonatal intensive care unit at UMC, spoke with both Bennett and Lewis. Bennett told Pruitt that he had been visiting a neighbor on the night of August 24, and that upon arriving home at 12:30 a.m. on the morning of August 25, he put Brandon in his car seat which was on the floor. Bennett said he woke up at 3:00 a.m. to find Brandon had toppled out of the car seat and was crying and lying on the floor. He told Pruitt that he placed Brandon back in the seat and went back to sleep.

At UMC, Brandon was placed under the care of Dr. Bonnie Woodall ("Dr. Woodall"), who the State would later call as an expert in pediatric emergency medicine. Dr. Woodall examined Brandon for head injuries and performed a complete neurological exam. She also looked over Brandon's body for evidence of trauma or infection, and she noticed that Brandon had bruising to his scalp in the "left ecchymosis" or "left frontoparietal scalp," bruising on his right scapula area, and bruising on his right lumbar area. She also observed swelling and discoloration along Brandon's upper left forearm. Dr. Woodall found multiple retinal hemorrhages in Brandon's eyes where blood had leaked out into the tissue of Brandon's retinas. Dr. Woodall stated that retinal hemorrhages to the degree suffered by Brandon "are associated with extreme trauma, motor vehicle accidents or injuries that require a great deal of force."

X-rays of Brandon's body displayed a fracture in the left parietal of his skull. A CT scan revealed that Brandon had a subdural hematoma, which is a collection of blood just outside the brain but within the covering of the brain. Additionally, the neurological assessment showed that Brandon was in a coma, meaning he had no response to pain and made no respiratory effort. The medical staff further noted there were no signs of brain function.

When Dr. Woodall asked for Brandon's history to help her diagnose and treat him, Bennett stated that Brandon was sleeping in the car seat located

4

on the floor, and that when he woke up and found Brandon on the floor, he put him back in the seat. In observing that the medical records included several versions provided by Bennett of when Brandon fell from the car seat, Dr. Woodall stated: "[i]n one notation, it was around 6:00 to 6:30. In another notation, it was 3:00 to 3:30 a.m. And another notation around 4:00 to 5:00 a.m." Brandon never awoke from the coma and was pronounced dead on August 27, [2000].

Master Sergeant Rodney Eriksen ("Sergeant Eriksen") of the Madison Police Department went to the hospital to obtain statements from Brandon's parents. Brandon's mother told him that she and Bennett did not live together, and that Brandon had been alone with Bennett on the night he was injured. Sergeant Eriksen asked Bennett to accompany him and Sergeant John Chance to the police station to give a statement. Bennett provided Sergeant Eriksen several conflicting versions of the incident. When Sergeant Eriksen asked how Brandon could have flung himself out of his car seat onto the floor, Bennett changed his story and claimed the car seat fell to the floor. Later, he changed his story again to say that he accidently kicked the car seat off the bed onto the floor while he was sleeping. Eventually, Bennett admitted to Sergeant Eriksen that he shook Brandon, claiming it was an effort to elicit a response from his unresponsive child. Bennett stated, "[y]eah, I shook him . . . I shook him too hard." However, Bennett maintained he was not trying to hurt Brandon, but rather was just trying to wake him. Sergeant Eriksen also questioned Bennett as to why he took Brandon to River Oaks instead of the Richland Police Department, one of the two fire stations, or the Baptist Medical Clinic which were all within one mile of his home. Bennett responded that it did not take long to get to the hospital, just ten or twenty minutes.

On November 7, 2000, a Rankin County grand jury indicted Bennett for capital murder. He was charged with the underlying crime of felonious child abuse. At pre-trial hearings on February 5 and 14, 2003, the court heard several defense motions including three motions to suppress, one motion to dismiss, and one motion to quash. Also at the February 14 hearing, the court considered and rejected Bennett's proffered guilty plea on the charge of heat of passion manslaughter. On February 18, 2003, jury selection began in the Rankin County Circuit Court, the Honorable William Chapman, III, presiding.

At trial, Dr. Woodall testified that Brandon had a subdural hematoma, diffuse swelling of the brain, a skull fracture, an intercranial hemorrhage, and extensive bilateral retinal hemorrhages. Dr. Woodall also stated that she could conclude to a reasonable degree of medical certainty that these injuries were not consistent with a child falling out of a car seat to the floor. She further

5

testified that a skull fracture associated with intercranial injuries, such as the type suffered by Brandon, is an "indication that there was a more severe trauma involved." Additionally, Dr. Woodall stated that, in children, a hematoma is often the result of shaken baby syndrome, or the severe and violent shaking of an infant. When asked about the force necessary to cause a subdural hematoma, Dr. Woodall noted that the injury required "pretty significant force, and it would have to be a fall with some sort of angular rotational component to it, as flipping over or rotating in some fashion before they strike a surface." Furthermore, Dr. Woodall testified that it would be impossible for a ten-week-old infant, such as Brandon, to have sustained these injuries alone.

Dr. Woodall's expert analysis concluded that Brandon did not fall out of his carrier. She stated to a reasonable degree of medical certainty that if the infant carrier was raised fourteen inches and placed on top of a box spring, the injuries Brandon suffered would not be consistent with him falling out of a carrier from that position.[1] According to Dr. Woodall, Brandon's injuries, to a reasonable degree of medical certainty, were consistent with being shaken and thrown down on a hard surface.

The State also consulted Dr. Andrew Parent ("Dr. Parent"), chairman of neurosurgery at UMC and an expert in the field of pediatric neurosurgery. Dr. Parent noted that Brandon had a bruise over his frontal area, that his pupils were fixed and dilated, and that he had hemorrhages in both eyes. Dr. Parent also noted that Brandon's CT scan showed the presence of a subdural hematoma, located under the dura (the tissue covering the brain) but on top of the brain, and a subarachnoid hematoma, located on top of the brain but beneath the subaracnoid membrane. The CT scan also revealed blood collected under the tentorium, the piece of tissue that separated the upper part of Brandon's brain from the lower part. According to Dr. Parent, the left parietal fracture and the hematoma were directly caused by blunt force trauma to the head. When asked what could have caused Brandon's injuries, Dr. Parent stated that to a reasonable degree of certainty, Brandon's injuries were consistent with "someone taking the ten week old baby and just shaking them[sic] throwing them [sic] to the ground." Dr. Parent testified that Brandon could not have lifted himself up out of the carrier, and these injuries could not have been caused by Brandon falling out of his carrier.

After Brandon's death, an autopsy was performed by Dr. Steven Hayne

---

[1] Bennett's bed turned out to be a mattress and a box spring sitting directly on the floor, with a total height of about fourteen inches.

6

("Dr. Hayne"), who would later testify as the State's expert in forensic pathology. Dr. Hayne testified that Brandon, who weighed only twelve pounds, had two skull fractures corresponding with a hemorrhage on the left side of his head and smaller hemorrhages on the right side of his head. Dr. Hayne also linked the hematoma to blunt force trauma, noting that the significant injury to the left side of the head, combined with the separate injuries on the right side, were consistent with a direct blow to the head. Dr. Hayne testified that in addition to the subdural hematoma, there were areas of hemorrhage over the surface of the brain itself. Dr. Hayne discredited the defense's theory that Brandon caused these injuries to himself, noting "it would be highly unlikely that a two month old could even raise himself up and sit on the edge of his carrier." Dr. Hayne opined to a reasonable degree of medical certainty that these injuries did not occur from a fall from an infant carrier located on the floor. Dr. Hayne also stated to a reasonable degree of medical certainty that Brandon's injuries were not consistent with Brandon falling from the carrier located on the bed. According to Dr. Hayne, even if the carrier fell over from the bed, it would not produce a subdural hematoma or cause the severe diffuse brain injury Brandon suffered. Dr. Hayne concluded that Brandon was the victim of shaken baby syndrome followed by some blunt force trauma impact.

We pause here to review the different versions of the event Bennett told to the medical staff and police. Bennett told Moreland that he awoke at 4:00 a.m. to find Brandon had slipped out of his car seat. He told Strickland that Brandon had been breathing funny at 4:00 a.m., but he did not fall out of his car seat until 8:00 a.m. at which point Brandon stopped breathing altogether. He told Jacobs that at 8:00 a.m. Brandon fell out of his car seat, which was located on the floor, but that Brandon simply started breathing funny at this point but did not stop breathing altogether. Bennett told Pruitt that Brandon fell out of his car seat, which was located on the floor, at 3:00 a.m. Bennett told Dr. Woodall that Brandon had been sleeping in his car seat on the floor and at some point—6:00 to 6:30, 3:00 to 3:30, or 4:30 to 5:00 a.m.—Brandon fell out of his car seat. Bennett told Dr. Parent several different stories, none of which included him kicking Brandon off the bed. Bennett told Lewis, Brandon's mother, that Brandon had been sleeping in his car seat, which was located on the floor, when he fell out of it. Later, after Bennett had been arrested, he told Lewis that the car seat was actually on top of the bed, and he had accidently kicked it off. Bennett told Sergeant Eriksen that Brandon woke him at 2:00 a.m. wanting to be fed, and that he awoke at 5:00 a.m. to find that Brandon had fallen out of his car seat, which had been placed on the floor. Bennett said that Brandon was breathing funny, but instead of taking him to the hospital, he fell back asleep. When awoken again by Brandon, Bennett

7

told Sergeant Eriksen that Brandon's breathing was still abnormal so he tried running water over him. Bennett later told Sergeant Eriksen that the car seat was not on the floor, but rather it had fallen off the bed. Bennett then told Sergeant Eriksen that he had accidently kicked the seat off the bed. Bennett also told Sergeant Eriksen that in addition to running water over Brandon, he shook Brandon to wake him. Bennett told Sergeant Eriksen three different possible times at which Brandon had fallen out of the car seat—at 5:00 a.m., 6:00 a.m., and closer to 7:00 a.m. Finally, it was not until his trial started that Bennett claimed the bedding had suffocated Brandon. Bennett was never able to explain the inconsistencies in his statements.

The jury found Bennett guilty of capital murder and, on February 28, 2003, sentenced him to death.

***Bennett I***, 933 So. 2d at 934-38 (first, third, fifth, & sixth alterations in original).

¶5.    In ***Bennett II***, this Court granted Bennett permission to file a petition for post-conviction relief, albeit on only one of the grounds he requested—his contention that he received ineffective assistance of counsel during the penalty phase of his trial. ***Bennett II***, 990 So. 2d at 159. Specifically, Bennett claimed that his trial counsel failed to investigate his history of a traumatic childhood, mental disorders, and substance abuse. *Id.* at 159. This Court concluded that Bennett was entitled to an evidentiary hearing on his claims. *Id.* at 160.

¶6.    In September 2008, the Mississippi Supreme Court Clerk issued this Court's mandate that the "Petition for Leave to Seek Post-Conviction Relief [was] granted in part and denied in part . . . ." As noted above, the evidentiary hearing was not held until twelve and a half years later, on March 25, 2021. The court heard testimony from Rhonda Triplett Carter, mitigation investigator; Dr. Brushan Agharkar, forensic psychiatrist; and Ed Rainer, Bennett's trial counsel. The State called no witnesses.

¶7.    Carter testified that she had prepared a psychosocial timeline for Bennett. Her

8

timeline "outline[d] the interactions of the client from behaviors and any outbursts that can," she said, explain behaviors from his birth to a few years after he was arrested for his son's murder. Carter's outline showed that Bennett had a long history of drug abuse, antisocial behavior, and failed attempts at reform or treatment.

¶8. Dr. Agharkar, the forensic psychiatrist, testified he had worked on more than 1,100 death penalty cases. Dr. Agharkar examined Bennett several times in the years following the trial, and he interviewed a few people suggested to him by Bennett. Dr. Agharkar concluded that Bennett suffers from "complex PTSD,"[2] bipolar disorder, and polysubstance dependence. Dr. Agharkar further explained that it is not uncommon to for him to work with patients who are uncooperative.

¶9. Finally, Bennett's trial attorney, Ed Rainer, testified at the evidentiary hearing. Rainer was an experienced attorney—licensed for almost thirty years at the time of the trial—but Bennett's was his first death penalty case. Rainer discussed his investigations, his strategy at trial, and the reasons for some of his decisions. Notably, Rainer testified that Bennett did not appear to have psychological problems but that after learning about Bennett's background, he came to understand that Bennett "had to have some sort of psychological problems or that he was able to overcome them." Rainer suggested several times that Bennett see a psychiatrist, but Bennett had adamantly refused. Rainer explained that his goal at trial was for the jury to conclude that Bennett was innocent, and, failing that, to doubt his

---

[2] On cross-examination, Dr. Agharkar admitted that "complex PTSD" is not a DSM diagnosis, even in the present day, and that at the time of Bennett's trial, his condition would have "probably [been] under disorders of extreme stress not otherwise specified."

guilt, and he did not think excusing Bennett's conduct by reference to drug dependency would have been an effective trial strategy. In fact, Rainer's investigator had been told Bennett had used drugs the night of his son's death, something that did not come out at his trial; Rainer described his near-total success keeping Bennett's drug use out of the trial as a "miracle."

¶10. The circuit court ultimately denied Bennett's petition for post-conviction relief. The trial court reasoned that while Rainer's strategy was unsuccessful, that does not mean he was constitutionally ineffective under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). The trial court further found that Bennett's proposed mitigation case, which would have brought his drug and alcohol use to the forefront, "just would not have gone well" with the jury.

## ISSUES

¶11. On appeal, Bennett argues:

(1) trial counsel was inexperienced in capital litigation and conducted no mitigation investigation or any preparation at all for the sentencing phase of trial;

(2) trial counsel's representation was so deficient that prejudice is inherent and should be presumed;

(3) even if prejudice is not presumed, it is established because there exists a reasonable probability of a different sentence, and the sentencing phase was fundamentally unfair based on trial counsel's complete failure to prepare; and

(4) the circuit court compounded its constitutional error by excluding relevant mitigation evidence in post-conviction based on a non-existent state rule.

10

¶12. To streamline our discussion, we shall discuss the issues in a different order.

## DISCUSSION

### 1. *Cronic* has no application here.

¶13. Bennett's first two issues revolve around his claim that counsel's performance was *per se* ineffective assistance of counsel under ***United States v. Cronic***, 466 U.S. 648, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984). "***Cronic*** recognized a narrow exception to ***Strickland***'s holding that a defendant who asserts ineffective assistance of counsel must demonstrate not only that his attorney's performance was deficient, but also that the deficiency prejudiced the defense." ***Florida v. Nixon,*** 543 U.S. 175, 190, 125 S. Ct. 551, 160 L. Ed. 2d 565 (2004). ***Cronic*** identified three circumstances that are so likely to prejudice the accused that prejudice is presumed: "(1) when counsel is completely denied; (2) when counsel entirely fails to subject the prosecution's case to meaningful adversarial testing; (3) and when counsel is called upon to render assistance under circumstances where competent counsel very likely could not." ***Johnson v. State***, 29 So. 3d 738, 748 (Miss. 2009) (citing ***Cronic***, 466 U.S. at 659-60).

¶14. As will be discussed in detail below, there is simply no basis for Bennett's assertion that he suffered a complete denial of assistance of counsel at sentencing, actual or constructive. Counsel called several witnesses and developed and argued a coherent, strategic theory. "***Cronic*** is reserved only for those extreme cases in which counsel fails to present any defense." ***Branch v. State***, 882 So. 2d 36, 65-66 (Miss. 2004) (quoting ***Haynes v. Cain***, 298 F.3d 375, 381 (5th Cir. 2002)). Bennett's contention is that his attorneys should

11

have put on a better mitigation case, which is insufficient to meet the *Cronic* standard.

> **2. The trial court's refusal to allow Bennett to depose two proferred witnesses had no effect on the outcome.**

¶15. Prior to the trial, Bennett sought to take what he styled "perpetuation" depositions of various people, two of which the trial court denied—Jennifer Clukey, Bennett's cousin, and Kara Gialluca, a childhood friend. These individuals lived out of state and, according to PCR counsel, would not "drive 12 hours both ways with a COVID epidemic going on" to testify in person. The trial court denied the depositions, while allowing several others, for several reasons, including that Clukey and Gialluca's affidavits had not been attached to the PCR motion.

¶16. According to Bennett, "Clukey knew Devin as a child and said he was sometimes without clothing and food. She also attested that Devin was kindhearted and 'struggled to overcome the manner in which he was raised.'" "Gialluca observed Devin's 'very bad home life' and 'rough upbringing.' She describes Devin's fear of his father, and she saw Devin's cigarette burns and bruises."

¶17. As will be explained in detail below, this proffered testimony would have had no impact on the outcome of the PCR hearing. Thus, any error resulting in their exclusion would have been harmless.

> **3. Bennett failed to show ineffective assistance of counsel.**

¶18. To evaluate a claim of ineffective assistance of counsel, we apply the two-prong test laid out by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). "First, the defendant must show that counsel's performance was deficient." *Id.* at

12

687. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* "Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.*

¶19. Bennett devotes most of his briefing to the various mitigating factors he argues counsel failed to adequately investigate for the sentencing hearing. Essentially, Bennett contends that his counsel failed to uncover that he was abused as a child and suffered from substance abuse and minor psychological disorders (such as bipolar disorder and "complex" PTSD) as a result. In a recent decision, this Court looked back at our 2008 opinion granting Bennett permission to file the instant petition for post-conviction relief. We summarized Bennett's allegations in his petition as follows:

> In **Bennett** [**II**] the Court granted death-row inmate Bennett leave to seek post-conviction in the trial court based on counsel's ineffectiveness at sentencing. **Bennett** [**II**], 990 So. 2d at 157. In post-conviction proceedings, one of Bennett's counsel provided an affidavit stating that counsel (1) knew Bennett had abused chemical substances but later learned that Bennett's substance-abuse problem was "much worse than my investigation [had] revealed"; (2) did not seek mental-health experts or a mitigation investigator; (3) had no psycho-social history prepared; (4) knew that Bennett had had a troubled childhood because of his parents' drug abuse; (5) and had no knowledge that Bennett had been diagnosed with mood disorder as a child. *Id.* at 159. In addition to counsel's affidavit, Bennett offered affidavits from "several witnesses [who] would have attested to Bennett's traumatic childhood, mood disorders, and substance-abuse history." *Id.*

*Powers v. State*, No. 2017-DR-00696-SCT, 2023 WL 6307965, at *67 (Miss. Sept. 28, 2023)

¶20. Bennett's PCR case has since been tried at an evidentiary hearing, and trial counsel

was cross-examined regarding his affidavit. After reviewing the records of the PCR petition and the original trial, we conclude that—although he never articulated it as such at the hearing—counsel devoted his attention and resources to the sentencing-phase strategy of "residual doubt." In his opening statement, counsel told the jury he believed Bennett was innocent and that Bennett would not have intentionally hurt his son. In fact, the record shows that counsel effectively had no choice because Bennett himself made it clear he would testify at the sentencing hearing and that he would not concede guilt.

¶21. Residual doubt describes a strategy in which a capital defendant, though convicted by the jury, hopes to avoid a death sentence by appeal to residual doubt regarding his guilt or the circumstances of the offense. "[J]urors who decide both guilt and penalty are likely to form residual doubts or 'whimsical' doubts . . . about the evidence so as to bend them to decide against the death penalty. Such residual doubt has been recognized as an extremely effective argument for defendants in capital cases." *Lockhart v. McCree*, 476 U.S. 162, 181, 106 S. Ct. 1758, 90 L. Ed. 2d 137 (1986) (citation omitted). The United States Supreme Court has suggested that after being convicted of capital murder, a defendant has no constitutional right to present evidence of innocence or to have the jury instructed on residual doubt at sentencing. *See* *Oregon v. Guzek*, 546 U.S. 517, 126 S. Ct. 1226, 163 L. Ed. 2d 1112 (2006). But the strategy has been empirically found to be "the most powerful 'mitigating' fact" and "the best thing a capital defendant can do to improve his chances of receiving a life sentence." *Tarver v. Hopper*, 169 F.3d 710, 715 (11th Cir. 1999) (quoting Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What do Jurors Think?*,

98 Colum. L. Rev. 1538, 1563 (1998)). The Eleventh Circuit has held that "focusing on acquittal at trial and then on residual doubt at sentencing (instead of other forms of mitigation) can be reasonable" and that "when . . . the evidence of guilt was not overwhelming, we expect that petitioners can rarely (if ever) prove a lawyer to be ineffective for relying on this seemingly reasonable strategy to defend his client." *Chandler v. United States*, 218 F.3d 1305, 1320 (11th Cir. 2000) (footnote omitted) (citations omitted). The Fifth Circuit has likewise recognized that "residual doubt may be a reasonable, even highly beneficial, strategy in a capital case." *Martinez v. Quarterman*, 481 F.3d 249, 256 (5th Cir. 2007) (citing *Moore v. Johnson*, 194 F.3d 586, 618 (5th Cir. 1999)).

¶22.   The reasonableness of counsel's actions may be influenced by the defendant's own statements or actions. *Strickland*, 466 U.S. at 691. Not only did Bennett's attorney employ a minimally competent trial strategy in arguing residual doubt, Bennett himself forced his attorney to argue it. The transcript of the trial leaves no doubt that Bennett maintained his innocence even after being convicted. The United States Supreme Court has recently made expressly clear that an attorney must respect the defendant's decision whether or not to admit guilt, even after he has been convicted. "[A] defendant has the right to insist that counsel refrain from admitting guilt, even when counsel's experienced-based view is that confessing guilt offers the defendant the best chance to avoid the death penalty." *McCoy v. Louisiana*, 138 S. Ct. 1500, 1505, 200 L. Ed. 2d 821 (2018). At the sentencing hearing, Bennett insisted on testifying, against the advice of counsel, and he adamantly maintained his innocence.

¶23.   Other than Bennett, defense counsel called Yolanda Lewis, the mother of the infant

15

victim, who testified that Bennett wanted the child "more than [she] did." Lewis testified that she believed Bennett was innocent and "would never have done anything intentionally to harm Brandon." Bennett's father, Dale Bennett, testified regarding Bennett's difficult childhood—the neglect he suffered as a result of his parents' substance abuse, his difficulty in school and his hyperactivity, his receiving therapy from the age of ten or so. While one might fault the testimony for its brevity, neither Bennett's father nor the child's mother were cross-examined by the prosecution, and Bennett's mitigation case at trial managed to largely avoid the "double-edged" aspect of the proposed PCR mitigation case—delving into Bennett's history of drug abuse and antisocial behavior.

¶24.    Rainer, Bennett's attorney, explained at the PCR hearing that he had wanted to avoid opening the door to Bennett's history of substance abuse because he had obtained an agreement in limine precluding both sides from discussing Bennett's prior drug use. Rainer's investigation had revealed that Bennett was a regular user of marijuana and that the night of Brandon's fatal injuries, Bennett had taken Brandon along to visit a woman, and Bennett had smoked marijuana with the woman.[3] We also observe that Bennett apparently lied under oath at a pretrial suppression hearing when he denied using drugs that night.

¶25.    Rainer was concerned the jury would "take [Bennett's history of drug use including on the night of his son's death] and the fact that he had been—had caught that felony [drug]

_____

[3] Rainer's investigator had interviewed the woman and Bennett's two roommates in the hopes that they "didn't hear any yelling and screaming" that night, but he cryptically added that "that just didn't work out for us." Rainer later said on cross-examination that one of them said, "Devin did something to that child." Neither the woman nor Bennett's roommates testified at trial.

16

charge in Florida [while awaiting trial for capital murder here] and they would get the idea that he's just a drug head and a drug head killed his child." He also testified that he believed discussing Bennett's drug use during the mitigation phase would have "hurt him," an observation that the trial court found both to be correct and critical to evaluating Bennett's post-conviction claims.

¶26. We do observe that, despite counsel's efforts, Bennett insisted on testifying and volunteered that he had used and sold drugs at some indefinite point in the past. But he said so only in the most general terms, and it did not become a focus of the sentencing hearing; it garnered only a brief mention by the prosecutor in his closing argument.

¶27. Rainer described his success at keeping Bennett's drug use out of the trial as "a miracle."

¶28. This Court has recently held that no prejudice resulted from an attorney's failure to investigate and present evidence, as a mitigating factor, that a capital-murder defendant suffered from fetal alcohol spectrum disorder [FASD]. *Garcia v. State*, 356 So. 3d 101, 114 (Miss. 2023). We observed that other courts, such as the Fifth Circuit, have found that evidence the defendant suffered from FASD "would have been a double-edged sword as far as mitigating evidence—it was just as likely to persuade jurors that the death-penalty was appropriate." *Id.* (citing *Trevino v. Davis*, 861 F.3d 545, 551 (5th Cir. 2017)). This was because "it suggests . . . future dangerousness." *Id.* We quoted *Brown v. Thaler*, a Fifth Circuit decision, which held that "[t]he evidence that Brown claims his counsel should have presented is 'double-edged' because, although it 'might permit an inference that he is not as

17

morally culpable for his behavior, it also might suggest [that he], as a product of his environment, is likely to continue to be dangerous in the future.'" ***Brown v. Thaler***, 684 F.3d 482, 499 (5th Cir. 2012) (second alteration in original) (quoting ***Ladd v. Cockrell***, 311 F.3d 349, 360 (5th Cir. 2002) (inadequate supervision as a child as future dangerousness)). We also cited ***Sells v. Stephens***, 536 F. App'x 483, 495 (5th Cir. 2013) (fetal alcohol syndrome), and ***Gates v. Davis***, 660 F. App'x 270, 278 (5th Cir. 2016) (fetal alcohol syndrome).

¶29.    The United States Supreme Court has said the same thing about mental retardation and a history of abuse as a child: "Perry's mental retardation and history of [childhood] abuse is thus a two-edged sword: it may diminish his blameworthiness for his crime even as it indicates that there is a probability that he will be dangerous in the future." ***Perry v. Lynaugh***, 492 U.S. 302, 324, 109 S. Ct. 2934, 2949, 106 L. Ed. 2d 256 (1989), *abrogated by* ***Atkins v. Virginia***, 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002), *and holding modified by* ***Boyde v. California***, 494 U.S. 370, 110 S. Ct. 1190, 108 L. Ed. 2d 316 (1990).

¶30.    Other United States Courts of Appeal have recognized that it is not deficient performance for defense counsel not to present double-edged evidence in mitigation: "[W]e have repeatedly stressed that evidence of intoxication or alcoholism is a double-edged sword that itself could harm a petitioner's case." ***Mashburn v. Comm'r, Ala. Dep't of Corr.***, 80 F.4th 1292, 1302 (11th Cir. 2023) (quoting ***Brooks v. Comm'r, Ala. Dep't of Corr.***, 719 F.3d 1292, 1304 (11th Cir. 2013)). "That a diagnosis of antisocial personality disorder has negative characteristics or presents a double-edged sword renders it uniquely a matter of trial strategy that a defense lawyer may, or may not, decide to present as mitigating evidence."

18

***Morton v. Sec'y, Fla. Dep't of Corr.***, 684 F.3d 1157, 1168 (11th Cir. 2012).  The Eleventh Circuit has specifically recognized the danger of such double-edged evidence when the primary mitigation theory is residual doubt:

> Indeed, we have repeatedly stressed that evidence of intoxication or alcoholism is a double-edged sword that itself could harm a petitioner's case.  *See **Housel v. Head***, 238 F.3d 1289, 1296 (11th Cir. 2001).  A panel of this Court has gone as far as saying that a "history of excessive alcohol and drug use" is not even "evidence in mitigation of the death penalty," and that "admission of some of this evidence might have been harmful to [petitioner's] case."  ***Waldrop v. Jones***, 77 F.3d 1308, 1313 (11th Cir. 1996); *see also **Suggs** [**v. McNeil**, 609 F.3d 1218, 1231 (11th Cir. 2010)]* ("As we have repeatedly recognized, evidence of drug and alcohol use is often a two-edged sword that provides an independent basis for moral judgment by the jury." (internal quotation marks and citations omitted)).  In this case in particular, the evidence of alcoholism or intoxication might well have seemed inconsistent with trial counsel's penalty-phase argument, which focused on any residual doubt that the jury had regarding Brooks's guilt.  While an intoxication-mitigation strategy attempts to lessen the defendant's culpability for an act he concededly committed, a residual-doubt strategy depends on the defendant maintaining his innocence.  *See **Hubbard v. Haley***, 317 F.3d 1245, 1260-61 (11th Cir. 2003).  That Brooks's intoxication evidence could have blunted the force of his residual-doubt argument is merely another way in which the new mitigating evidence could have hurt Brooks as easily as it could have helped him.

***Brooks***, 719 F.3d at 1304 (first & second alterations in original).

¶31.    "[E]vidence about mental health problems . . . often possesses a double-edged nature, as jurors may conclude that the defendant is simply beyond rehabilitation."  ***Frederick v. Quick***, 79 F.4th 1090, 1120 (10th Cir. 2023) (second alteration in original) (citation omitted).  "[E]vidence of defendant's family history of schizophrenia and his own psychological problems had not been presented to the jury; such evidence could have undermined [his] 'residual doubt' defense and also introduced otherwise unadmitted negative testimony about defendant's behavior when consuming alcohol.  ***Smith v. Mullin***, 379 F.3d 919, 943 n.11

(10th Cir. 2004) (citing *McCracken v. Gibson*, 268 F.3d 970, 979–80 (10th Cir. 2001))

¶32.    "[A]ny evidence of brain damage would be double-edged and might well do more harm than good for Owens's mitigation case, because it would bespeak his inability to become less violent." *Owens v. Stirling*, 967 F.3d 396, 428 (4th Cir. 2020).  Likewise, "the additional mitigation evidence Morris presented in post-conviction proceedings was double-edged because it showed both a history of personality problems in Morris and his family and a history of drug abuse and illegal activity." *Morris v. Carpenter*, 802 F.3d 825, 843 (6th Cir. 2015).

¶33.    Bennett's proposed mitigation case would have consisted of the witnesses who testified at the hearing, detailed above, as well as treatment records and deposition testimony of relatives and childhood friends.  It would have focused on the neglect and abuse he alleges he suffered during childhood as a result of his parents' substance abuse, as well as his own substance abuse from an early age, and it would have detailed his extensive history of failed treatments and rehabilitations.

¶34.    The danger that the additional evidence would be double-edged is not hypothetical in Bennett's case.  While we will not attempt to exhaustively list all of it, Bennett's proposed mitigation evidence is riddled with documentation of persistent misconduct and impulsive criminal and violent behavior.  For example, a psychological report from age eleven showed that despite showing at least average intelligence [Bennett's IQ was measured at 99 despite not putting full effort into the test], Bennett reportedly

> disrespects and defies authority figures, initiates fights, bullies, and is aggressive both physically and verbally.  Devin destroys property belonging

20

to himself, school, and others, and does not change his behavior following discipline. He is unable to show self-control when provoked, refuses to follow rules, and blames others. He has been noted to lie and use profanity. In the classroom he lacks enthusiasm, wanders around and exerts little effort. Socially, he appears to be disliked.

The psychologist who examined Bennett at age eleven noted that Bennett "readily admitted that he lies and does not listen to adult authority figures" and that he "is unable to regulate his emotions and is quick to anger." By age fifteen, Bennett was stealing, using marijuana daily, had "poor impulse control" and "bec[ame] easily angered" whether under the influence of drugs or not.

¶35. Bennett's records from Covenant House (a shelter) show a similar pattern of attitudes and conduct that continued from the first time was admitted after quitting high school (1996) to after his arrest for his son's murder. In total, Bennett was in and out of Covenant House twelve times, with most of his departures being expulsions for misconduct. Even after being readmitted following his arrest for his son's death, Bennett was soon ejected in part for allegedly sexually harassing four other residents. Prior to Brandon's death, Bennett was discharged from Covenant House for shoving other residents after a group therapy session. At least two, other times Bennett was expelled for stealing or shoplifting.

¶36. At a drug rehab in early 1998, when Bennett was approximately eighteen years old, Bennett was discharged after less than a month "based on ongoing verbal altercations with peers, destruction [of] [rehab facility] property, inability to maintain an appropriate attitude towards treatment, and beginning to be a negative influence on the rest of his peers." Bennett was noted to display antisocial and narcissistic features upon discharge. Bennett's discharge

21

noted that he had said he did not suffer financial consequences of his drug use because "his family is wealthy and has been supporting him." At the rehab, Bennett made "superficial progress" "only as long as things were going his way."

¶37. Even his post-conviction psychologist, Dr. Agharkar, concluded that Bennett's various maladies, though resulting from abuse and a troubled childhood, "would be a contributing factor to his irritability and impulsivity around the time of the alleged crime."

¶38. In summary, delving into Bennett's past at the sentencing hearing could easily have led a jury to conclude he was persistently narcissistic, dishonest, short-tempered, and violent. While it is possible a jury might have taken pity on Bennett given his claimed history of childhood abuse, it is probable Bennett's proposed additional evidence would have ruled out any chance of success for his chosen defense strategy, residual doubt. A jury would also likely conclude that, after innumerable professional interventions spanning literally half his life, funded by his "wealthy family," that Bennett was unlikely to ever be rehabilitated. Indeed, Bennett's treatment records show that he was offered many opportunities to treat whatever ailments he suffered from, whether they were the legacy of neglect/abuse or personal failings—and time after time, Bennett simply chose not to avail himself of the help offered.

¶39. All that being said, it is arguable that counsel fell below the standard of a minimally competent attorney by failing to more fully investigate this potential theory of mitigation defense. Bennett had two attorneys at trial—Ed Rainer, who was lead counsel, and Scott Williamson, whom Rainer characterized as a young associate. At the time of the trial, Rainer

was a very experienced attorney, but he had never tried a capital case before. Williamson did not testify or submit an affidavit for the PCR hearing.

¶40.    At the hearing—fifteen years after the fact—Rainer testified to his recollection of his investigations. Rainer's recollection was obviously imperfect, as, among other things, he forgot one of the witnesses he had called at the mitigation hearing and apparently forgot that he had corresponded with Covenant House, a shelter where Bennett stayed at times before and after his arrest.[4] Rainer noted that he had discussed Bennett's upbringing and treatments with Bennett's father and that he was aware that Bennett had "more than just a difficult childhood and upbringing." Rainer repeatedly advised Bennett that he should see a psychiatrist, but Rainer ultimately deferred to Bennett's refusal to do so. Rainer further testified that it was difficult to locate other witnesses to testify about Bennett's upbringing because he had grown up out of state and had moved around often as a child. Rainer was also preoccupied with securing an out-of-state subpoena for his expert, since he was not sure she would come to testify voluntarily due to scheduling changes; Bennett had balked at a plea offer during the colloquy two days before the start of the trial. Rainer also produced time sheets, which he testified had recorded the substantial work he and Williamson had done, though he admitted at various times that he had done things not recorded in the time sheets, including investigation for the mitigation phase of the trial.

---

[4] Notations in the Covenant House records documented that Bennett had refused to sign a form allowing it to share his information with Rainer, though Bennett had agreed to various other releases of his information. Rainer's time sheets indicate that he had some contact with Covenant House around this time, but it is not clear whether the request for permission originated with Covenant House or with Rainer; and Rainer did not seek a court order allowing him access to Bennett's records.

¶41. Regarding his investigation for mitigation, Rainer recalled:

A. Well, there was little that we could do. I talked to Devin about it. I talked to his father about it. I had a real soft spot in my heart for Devin because from what Devin told me—and I think it's probably been borne out—he was not raised up as a child. He was jerked up. He come from a broken home. He come from parents that were addicts.

Q. They had problems, didn't they?

A. Real problems. And, honestly, I wanted a psychologist to testify. I wanted Devin to see a psychologist to testify even in the—especially in the guilt phase. I'm sorry. Not the guilt phase but in the mitigation phase. And Devin nixed that. I don't know—well, I do know why. Devin—I think I know why.

Devin was a person, and he probably still is, that outwardly—back at that time, he was . . . calm, he was collected, but I could see that there was a lot of undercurrent in him, seething. And I laid it all off to the way he was raised. But I mentioned a psychologist, and he just said, No, I will not see a psychologist. And I don't know whether it would have helped or whether it would have hurt, but in any event, we did not present a psychologist at that phase, and it would have been—I think it would have been advantageous for him.

¶42. Rainer also testified that while Bennett largely presented as normal, he became aware of "a lot of undercurrent in him, seething" that, we imagine, could have given Bennett good reason to suspect that further investigation would produce double-edged mitigation evidence at best.

¶43. At any rate, this Court is not required to decide whether Rainer was ineffective vel non, as *Strickland* is a two-part test, and it is apparent that the trial court correctly found that the alternative mitigation would have been inferior to the one presented at trial. Moreover, other than the psychological testimony and psychosocial timeline, Bennett's PCR mitigation case is almost entirely cumulative to Bennett's father's testimony at the sentencing hearing

24

to the same effect—he testified that Bennett was "born into a dysfunctional family," that both his parents were alcoholics, that Bennett's mother was "a woman of loose morals" who "subjected [Bennett] to seeing things sexually." He also testified that Bennett was "a little bit" physically and mentally abused.

¶44. As detailed above, Bennett's PCR mitigation case would have blamed his parents more and detailed specific instances of abuse and neglect; but playing up the severity of the abuse Bennett suffered would have had the double-edged effect of suggesting that Bennett himself was more likely to have abused his child; "abuse begets abuse" and the "cycle of abuse" are tropes of popular psychology even without Bennett's extensively documented history of antisocial attitudes and behavior.

¶45. On appeal, Bennett also contends that his attorney failed to develop testimony from his child's mother, Yolanda Lewis, concerning her view of Bennett as a father. He contends that, based on the attorney's testimony at the PCR hearing, the attorney erroneously believed Lewis's account would have been inadmissible. But even a cursory review of the transcript of the sentencing hearing belies this claim.

¶46. Rainer, the attorney, did testify that he wished he had been able to call Lewis to testify to various things—"that [Bennett] was a good father and that all the time that he had been around that child with her present, he had been careful with the child. He was loving and a good father." But it is apparent from the context that Rainer meant he wished he had been able to ask such questions of Lewis during the guilt phase of the trial. Indeed, Lewis's testimony during the guilt phase was the subject of a motion in limine; the trial court

25

ultimately held that certain testimony regarding specific acts of kindness and affection by Bennett toward the child was inadmissible.

¶47. While Lewis's testimony at sentencing was brief, she did testify: "No one in this courtroom can know how much Devin loved Brandon. He wanted a child more than I did. If you could have just seen him with Brandon. I know in my heart Devin would never have done anything intentionally to harm Brandon. I know this." On appeal, Bennett suggests his attorney should have called Lewis and other witnesses to testify about specific instances of Bennett caring for or showing love toward the victim, but we cannot see such testimony as anything other than cumulative.

## CONCLUSION

¶48. We affirm the trial court's conclusion that Bennett's proposed mitigation case presented in his PCR would not have led to a reasonable probability of a different outcome due to its double-edged nature. *Garcia v. State*, 356 So. 3d 101, 114 (Miss. 2023). Any error in its refusing to permit him to present the testimony of two out-of-state witnesses by deposition is harmless given the cumulative nature of their testimony.

¶49. **AFFIRMED.**

**RANDOLPH, C.J., KITCHENS AND KING, P.JJ., COLEMAN, MAXWELL, BEAM, CHAMBERLIN AND GRIFFIS, JJ., CONCUR.**